**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Case No.: _____ _____

DAVID MIZRAHI, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

**CLASS ACTION**

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE EMPLOYEE**
**RETIREMENT INCOME SECURITY**
**ACT**

Plaintiff,

vs.

THE BEAR STEARNS COMPANIES, INC.,
JAMES E. CAYNE, ALAN D. SCHWARTZ,     **JURY TRIAL DEMANDED**
WARREN J. SPECTOR, SAMUEL L.
MOLINARO, JR., ALAN C. GREENBERG,
and DOES 1-20

Defendants.

Plaintiff David Mizrahi ("Plaintiff"), a participant in The Bear Stearns Companies, Inc.

Employee Stock Ownership Plan ("the ESOP" or "the Plan"), on behalf of himself and all others

similarly situated, alleges the following based upon personal knowledge as to Plaintiff and

Plaintiff's own acts, and upon information and belief as to all other matters based on, among

other things, the investigation conducted by and through Plaintiff's attorneys.

## I.

## INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement

Income Securities Act ("ERISA"), 29 U.S.C. § 1132, against the Plan's fiduciaries, on behalf of

participants in and beneficiaries of the Plan.

2.      Throughout the Class Period (December 14, 2006, through the present), the Plan

held substantial interests in the stock of The Bear Stearns Companies, Inc. ("the Company," or

1

"Bear Stearns"). Plaintiff held shares of Bear Stearns in his ESOP account during the Class
Period.

3.  Plaintiffs claims arise from the failure of defendants, who are fiduciaries of the
Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise
the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets
during the Class Period, as is required by ERISA.

4.  Plaintiff alleges that Defendants allowed imprudent investments of the Plans
assets/participants' retirement savings in Bear Stearns equity throughout the Class Period, despite
the fact that they clearly knew or should have known that such investment was imprudent due to,
inter alia: (a) the Company's failure to disclose material adverse facts about its financial well-
being; (b) the foreseeable deleterious consequences to the Company resulting from its substantial
entrenchment in the subprime mortgage market; (c) the fact that, as a consequence of the above,
the Company's stock price was artificially inflated; and (d) the fact that heavy investment of
retirement savings in Company stock would inevitably result in significant losses to the Plan, and
consequently, its participants.

5.  This action is brought on behalf of the Plan and seeks losses to the Plan for which
defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and
1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks
other equitable relief from defendants, including, without limitation, injunctive relief and, as
available under applicable law, constructive trust, restitution, and other monetary relief.

6.  As a result of defendants' fiduciary breaches, as enumerated and described
herein, the Plan has suffered substantial losses, resulting in the depletion of hundreds of millions

2

of dollars of the retirement savings and anticipated retirement income of the Plan's participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

7.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.  Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

8.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## II.

## JURISDICTION AND VENUE

9.     **Subject Matter Jurisdiction**.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

3

10.     **Personal Jurisdiction**. ERISA provides for nation-wide service of process,

ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the defendants are residents of the United

States and this Court therefore has personal jurisdiction over them. This Court also has personal

jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to

the jurisdiction of a court of general jurisdiction in the State of New York.

11.     Venue. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some defendants reside or

maintain their primary place of business in this district. Moreover, the Company maintains its

corporate offices in this district.

## III.

## PARTIES

### A.     Plaintiff

12.     Plaintiff David Mizrahi is a "participant," within the meaning of § 3(7) of ERISA,

29 U.S.C. § 1102(7), in the ESOP and held Bear Stearns shares in his ESOP account during the

Class Period.

### B.     Defendants

13.     Defendant Bear Stearns is a Delaware corporation with its principal place of

business at 383 Madison Avenue, New York City, New York 10179. Through its broker-dealer

and international bank subsidiaries, Bear Stearns provides investment banking, securities and

derivative trading, clearance, and brokerage services worldwide. Bear Stearns was both the

sponsor and the administrator of the ESOP, and as such was a fiduciary of the Plan within the

4

meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

## 1.    Director Defendants

14.    Defendant James Cayne ("Cayne") served as the Chief Executive Officer of the Company and Chairman of the Board during, the Class Period. Defendant Cayne became CEO of the Company on June 25, 2001 and prior thereto was President of the Company. On January 8, 2008, Defendant Cayne announced his retirement from the Company as CEO. Although Cayne retired from the firm as CEO he continues to serve in his capacity as Chairman of the Board. Cayne was a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21.)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

15.    Defendant Alan C. Greenberg ("Greenberg") served as the Chairman of the Executive Committee and was a director of the Company during the Class Period. Defendant Greenberg was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

16.    Defendant Allan D. Schwartz ("Schwartz") served as Co-President and Co-Chief Operations Officer ("COO"), and was a director of the Company during the Class Period. He became sole President on August 5, 2007 and replaced Defendant Cayne as CEO on January 8, 2008. Defendant Schwartz was a fiduciary of the plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the

5

management and administration of the Plan and/or management and disposition of the Plan's assets.

17. Defendants Cayne, Greenberg, and Schwartz are hereinafter collectively referred to as the "Director Defendants."

## 2. Executive Committee Defendants

18. The Company Executive Committee consists of both Board and non-Board members, but may function in a manner comparable to that of a Board committee. The Executive Committee has the authority to take action with respect to matters delegated to it by the Board.

19. Upon information and belief, the Executive Committee was charged by the Board with responsibilities over the Plan. These duties, upon information and belief, included oversight of any "day-to-day" Plan administrative and/or investment individual fiduciaries or committees, monitoring of Plan investment policy and overall management/performance of Plan assets,

20. The members of the Executive Committee during the Class Period included: Defendant Greenberg, Defendant Schwartz, Defendant Warren J. Spector, and Defendant Samuel L. Molinaro, Jr.

### a. Samuel L. Molinaro, Jr.

21. Defendant Samuel L. Molinaro, Jr. ("Molinaro") served as Executive Vice President and Chief Financial Officer and was a director of the Company during the Class Period. On August 5, 2007 he was appointed as COO. Defendant Molinaro was a fiduciary of the Plan within the meaning of discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

6

**b.**     **Warren J. Spector**

22.     Defendant Warren J. Spector ("Spector") served as Co-President and Co-COO during the Class Period. On August 5, 2007, Defendant Spector resigned from those positions. Defendant Specter was a fiduciary of the Plan within the meaning of discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendants Greenberg, Spector, Schwartz, and Molinaro are also hereinafter collectively referred to as the "Executive Committee Defendants."

24.     Upon information and belief, the Executive Committee Defendants delegated day-to-day Plan administrative and investment responsibilities to Company personnel/Plan Committees. Plaintiff will add these "Doe" defendants after further investigation reveals the contours and identities of any such delegation.

**3.**     **Additional "Doe" Defendants**

25.     Without limitation, unknown "Doe" Defendants 1-20 include other individuals, including members of the Plan fiduciary committees, as well as other Company officers, directors, and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period. The identities of the Doe Defendants are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek to join them to the instant action under their true names.

## IV.

## THE PLAN

26.     The Bear Stearns Companies, Inc. Employee Stock Ownership Plan (the "Plan" or

7

the "ESOP") is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and, further, is a "defined contribution plan" within the meaning of ERISA § 3(34) of ERISA, 29 U.S.C. § 1002(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

27.    The Plan is an "eligible individual account plan" ("EIAP") designed to invest primarily in employer securities pursuant to ERISA § 407(d)(6), § 3(2)(A), 29 U.S.C. § 1107(d)(6).

28.    The Plan, adopted effective October 29, 1985, is a combination of two stock bonus plans. One portion of the ESOP purportedly constitutes a tax credit employee stock ownership plan under section 409 of the Internal Revenue Code. The other portion of the ESOP purportedly constitutes a qualifying plan under Section 401(a) of the Internal Revenue Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Internal Revenue Code and subject to the applicable provisions of ERISA.

29.    Upon information and belief, as of December 31, 2004, the ESOP covered all employees of the Company and its affiliates. However, employees were not permitted to become participants in the ESOP after December 31, 2004.

30.    Custodial Trust Company is the Trustee of the ESOP.

31.    ESOP participants are not permitted to contribute to their accounts. Effective December 31, 2004, all participants in the ESOP became fully vested in their account balances.

8

From that time on, all ESOP participants have been permitted to redistribute a percentage of their vested assets to The Bear Stearns Companies Inc. Cash or Deferred Compensation Plan ("401(k) Plan").

32.     Upon information and belief, investments held by the ESOP consist almost exclusively of common stock of the Company. As of December 31, 2006 the ESOP held shares of Company stock valued at $370,235,134.

## V.

## DEFENDANTS' FIDUCIARY STATUS

33.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section. The defendants all had discretionary authority with respect to the management of the Plan anchor the management or disposition of the Plan's assets, and had discretionary authority or responsibility for the administration of the Plan. Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to comply with the requirement of § 402(a)(l) by internalizing this fiduciary function.

34.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. § 1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . ." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

9

## A.    Bear Stearns' Fiduciary Status

35.    The Company is the named sponsor and administrator of the Plan and during the

Class period exercised discretionary authority with respect to management and administration of

the Plan, and management and disposition of the Plan's assets. Bear Stearns or the Board is

authorized to appoint, and hence to monitor and remove, members of the Executive Committee.

36.    Upon information and belief, the Company was a named fiduciary of the Plan.

37.    The Company, at all times relevant to this Complaint, has exercised effective

control over the activities of its employees that performed fiduciary functions with respect to the

Plan. Through its Board or otherwise, the Company has had the authority and discretion to hire

and terminate such employees at will, and therefore is responsible for the activities of such

fiduciaries through principles of agency and *respondeat superior* liability.

## B.    The Director Defendants' Fiduciary Status

38.    The Director Defendants are responsible for appointing, and hence removing and

monitoring, individuals with direct responsibility for Plan administration and management, and

disposition of the Plan's assets.

39.    The Director Defendants exercised discretionary authority with respect to the

management and administration of the Plan and/or management and disposition of the Plan's

assets.

## C.    Executive Committee Defendants' Fiduciary Status

40.    The Board has charged the Executive Committee with the responsibility of

overseeing the administration of the Plan and management of the Plan funds. The Executive

Committee reports to the Board of Directors, which retained decision-making authority on behalf

10

of the Company.

41.     Upon information and belief, the Executive Committee is responsible for

appointing, monitoring, and removing the individuals responsible for day-to-day administration

of the Plan and the Plan's assets.

42.     In light of the foregoing responsibilities, actions, and duties, the Executive

Committee Defendants were fiduciaries of the Plan within the meaning of ERISA.

## VI.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of

persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time
> between December 14, 2006, and the present (the "Class Period") and whose
> accounts included investments in Company stock. Excluded from the Class
> are defendants, the officers and directors of the Company at all relevant
> times, members of their immediate families and their legal representatives,
> heirs, successors or assigns and any entity in which defendants have or had a
> controlling interest.

44.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the

Class.

45.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time,

and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands

of members of the Class who participated in, or were beneficiaries of, the Plan during the Class

Period.

11

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants acted as fiduciaries;

(b)     whether defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's participants and beneficiaries;

(c)     whether defendants violated ERISA; and

(d)     whether the Plan and, therefore, members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, as well as the Plaintiff and the other members of the Class, each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

50.     Class action status is also warranted under the other subsections of Rule 23(b)

12

because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.

## SUBSTANTIVE ALLEGATIONS

### A.   Background of Subprime Loan Industry

51.   Throughout the Class Period, the Company experienced vastly increased revenues, but much of that growth was the result of increased investments related to the subprime-mortgage industry.

52.   The basic premise behind the subprime-mortgage industry is that lenders weaken their underwriting standards to extend mortgage loans, at high borrower costs and interest rates, to individuals with poor credit, at higher loan-to-value ratios than a lender would offer to "prime" borrowers.

53.   Subprime loans are typically provided through unique mortgage products that are designed to provide temporarily low mortgage payments, which are subject to significant increases over the life of the loan. Typical subprime products include adjusted-rate mortgages ("ARMs"), which provide an initial low rate that is adjusted (typically upward) after a set period of time and interest-only mortgages, which defer payment of principal until some date in the

13

future.

54.    While subprime loans often prove to be profitable for lenders in the short term,

they carry a substantial risk for lenders that borrowers will fall behind in their payments, default

on their mortgages, and possibly force the lender to foreclose on the borrower's home. The risk

inherent in such loans becomes extremely heightened when home prices stagnate or decrease as

they did nationwide in 2006, 2007, and 2008.

55.    Beginning in 2005, delinquency rates on subprime loans nationwide began to rise.

According to the FDIC, total subprime delinquencies rose from 10.33 percent in the fourth

quarter of 2004 to 13.33 percent in the fourth quarter of 2006. Foreclosures rose from 1.47 to 2.0

percent over the same period.

56.    During the first half of 2007, lenders in the subprime market began to falter, in

many cases going out of business because defaults and delinquencies on subprime loans soared at

the same time that home prices fell.

57.    However, prior to and during the collapse of the subprime market, Bear Stearns

and other financial institutions traded heavily in collateralized debt obligations, or CDOs.

Generally speaking, CDOs are pools of bonds, loans, and other asset-backed securities. After

mortgages are written, investment banks pool them together and use the cash flows they produce

to pay off mortgage-backed bonds, which are underwritten by investment banks. The mortgage

bonds, in turn, are often packaged again into CDOs and sold to investors in slices. In 2006,

CDOs soaked up an estimated $150 billion of mortgage-backed bonds that were sold to investors

in slices. A CDO usually takes several months to assemble a portfolio of bonds before it raises

money from investors by issuing securities of its own. During the "ramp-up" period, CDO

14

managers (typically big money managers) work with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bears the risk of short-term fluctuations in prices of the bonds prior to the sale of the CDO.

## B.    Bear Stearns' Participation in the Subprime Mortgage Industry

58.    Despite the significant risks presented by the market for subprime mortgages, Bear Stearns was a major participant in that market and was thus at risk of significant losses as that market faltered in 2006, 2007, and 2008.

59.    Bear Stearns was heavily invested in the subprime-mortgage market, including CDOs and other mortgage-backed securities. By some accounts, the Company was the biggest packager of residential U.S. mortgage-backed securities from 2004 to 2007.

60.    Bear Stearns ran hedge funds that invested heavily in bonds backed by subprime mortgages. Those funds would eventually go bankrupt in July of 2007, leading to the obligation of the Company to rescue the funds, and the filing of suits against the Company for failing to disclose the extent of the funds' exposure to highly risky mortgage-backed securities.

61.    The problems in the subprime mortgage industry led to investors demanding higher returns on CDOs than they had previously, which made CDOs more difficult to sell and therefore drove down prices for CDOs. While many banks accordingly reduced their exposure to CDOs, Bear Stearns failed to take adequate measures to limit its exposure, and refused to admit that it was vulnerable as a result of the decline of the subprime-mortgage market.

62.    Instead, in early 2007, Bear Stearns increased its investments in the market. In February 2007, the Company purchased subprime mortgage firm Encore Credit Corp., which had closed $6.1 billion in loans in 2006. Also, in 2006, EMC Mortgage Corp. — a Bear Stearns

15

subsidiary — bought approximately $69.2 billion of subprime and "Alt-A" loans. "Alt-A" loans are made to borrowers without full documentation of income and ability to make loan payments. and in some cases involve loans with subprime terms.

63. Thus, when the market collapsed, Bear Stearns was trapped with a substantial amount of debt that it could not sell.

64. Defendants knew, or should have known, that Bear Stearns was a house of cards, that its tens of billions of dollars in subprime loans and its hedge funds that were heavily invested in bonds backed by subprime mortgages, created an unacceptable and imprudent risk for anyone invested in Company stock.

## C.  Throughout the Class Period, Defendants Consistently Misrepresented the Risks of Bear Stearns's Stock to investors and Plan Participants and Failed to Disclose Material Information

65. During the Class Period, Defendants made and issued inaccurate, misleading, and incomplete statements to investors and Plan participants. Those statements were wide-ranging, but primarily consisted of denials regarding the Company's over-exposure to the decline of the subprime market, the extent of the Company's exposure to the CDO market, the failure to take timely writedowns for losses, and positive statements about the Company's financial well-being.

66. These misstatements prevented the market, and most importantly Plan participants, from being able to fully assess Bear Stearns and its financial well-being. Defendants knew or should have known that the Company's stock price - and hence the Plan's assets - were at serious and immediate risk of plummeting once the market learned the truth about its financial condition.

16

67.     On the first day of the Class Period, December 14, 2006, Bear Stearns issued a press release regarding its fourth-quarter earnings, in which it stated that "in the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical origination of the mortgage platform, in addition, collateralized loan and debt organization activities increased substantially." Thus, Bear Stearns announced that even as other lenders were going out of business or taking unexpected losses due to problems in the mortgage industry, it was confident that it would perform better and that therefore it would increase its participation in the subprime mortgage industry.

68.     On March 15, 2007, Bear Stearns issued financial results for the first quarter of 2007. The Company reported strong growth in net earnings, Defendant Cayne stated, "we are pleased with this excellent performance, revenues for the first quarter were up for every business segment . . . Growing the company remains a core focus as we continue to invest in our domestic and international franchises with successful results." On the same day, Defendant Molinaro declared that "to date, problems in the subprime market have not spread to the broader market."

69.     On June 14, 2007, in reporting second-quarter results, Bear Stearns stated, "mortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in subprime and Alt-A mortgage sectors." However, Defendant Cayne stated, "the diversity of our franchise is clearly demonstrated in the record net revenues generated by this quarter."

70.     During June and July 2007, two hedge funds managed by the Company went bankrupt as a result of mortgage losses, costing investors $1.6 billion. In August of 2007, the

17

Company was sued by investors claiming that they were defrauded with respect to the hedge
funds' extreme exposure to mortgage-backed securities. It was recently announced that Bear
Stearns may face indictment over the collapsed funds.

71.     Since the collapse of the hedge funds, analysts have noted that Bear Stearns was
overexposed to the slumping mortgage market, which contributed to a 10 percent drop in net
income in the first quarter of 2007. Yet, following the collapse of the funds, Defendant Cayne
stated, "The firm is doing really well, and we are expanding in Asia and Europe . . . we have a
phenomenal franchise."

72.     On August 3, 2007, the Company issued a press release in response to the recent
decision by Standard & Poor's ("S&P") to change the Company's outlook, stating in part that
"S&P's specific concerns over issues relating to certain hedge funds managed by [the Company]
are unwarranted as these were isolated incidences and are by no means an indication of broader
issues at Bear Stearns." According to Defendant Cayne, "[O]ur franchise is profitable and
healthy and our balance sheet is strong and liquid . . . Bear Stearns' risk exposures to high profile
sectors are moderate and well-controlled."

73.     Notwithstanding Defendants' claims of financial solidarity and stellar
risk-management, the Company reported $200 million in losses and substantial expenses related
to collapsed mortgage-related hedge funds in the third quarter. Nonetheless, on September 20,
2007, Defendant Cayne said he was "confident in the underlying strength of our business and
proud of the effort and determination displayed by our employees during these challenging
times."

74.     Due to the vast problems within the subprime mortgage industry the stock prices

18

of many large lenders and investment banks dropped substantially. Hundreds of millions of

dollars worth of subprime mortgage securities became virtually worthless and numerous lenders

announced significant mortgage-related losses. In the face of the subprime mortgage crisis, the

Company's failed hedge funds, and the Plan's heavy investment in Company stock, Bear Stearns

denied the truth about its financial condition.

## D.    Bear Stearns' True Conditions, and the True Nature of the Stock, Are Revealed

75.    On October 12, 2007, *Business Week* published an article concerning the

implosion of two Bear Stearns hedge funds. As the article stated:

Ralph R. Cioffi seemed as cool and confident as ever. The market for subprime
mortgages was crumbling, but the 51-year--old manager of two Bear Stearns (BSC) hedge
funds offered nothing but reassurances to investors. "We're going to make money on
this," he promised his wealthy patrons in February. "We don't believe what the markets
are saying."

He should have known otherwise. The hedge funds were built so they were virtually
guaranteed to implode if market conditions turned south, according to a Business Week
analysis of confidential financial statements for both funds and interviews with forensic
accounting experts, traders, and analysts.

The funds had another potentially fatal flaw: an unusual arrangement with Barclays
(BCS) that gave the giant British bank the power to yank the plug - a deal that ran counter
to the interests of other investors, many of whom didn't even know about it.

The documents also cast serious doubt on the funds' supposedly strong performance
before their July bankruptcies. More than 60% of their net worth was tied up in exotic
securities whose reported value was estimated by Cioffi's own team - something the
funds' auditor, Deloitte & Touche, warned investors of in its 2006 report, released in
May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled
high with debt and managers all too eager to add to the heap.

### Spotlight on Hedge Funds

The revelations shed new light on the murky dealings inside the booming $1.3 trillion
hedge fund industry, which now accounts for up to a third of all daily trading on Wall
Street. They seem to underscore critics' biggest complaint: that many hedge funds use

astonishing amounts of leverage, or borrowed money, in sometimes reckless ways. The risks of "fair value" accounting, the practice that allows money managers to estimate the values of securities for which they can't find true market prices, are thrown into sharper focus as well. Coming soon, for better or worse: louder calls in Washington for more oversight of the largely unregulated hedge fund industry.

These new details could further damage the relationships that thousands of pension funds, university endowments, and wealthy individuals have with the Wall Street chieftains they entrust to manage their money. The Bear funds weren't stand-alone portfolios like the ones that blew up on Amaranth Advisors and Sowood Capital Management in recent years--they carried the imprimatur of one of the Street's oldest and most storied firms. The funds marketed themselves with the implicit backing of Bear Stearns and played up the fact that they were run by its experts in mortgage-backed securities. Now investors are left with a troubling question: If they can't count on big, well-established firms to operate hedge funds properly, whom can they count on?

## LASTING DAMAGE?

For Bear and its 72-year-old chairman and chief executive, James E. Cayne, the findings could prove troubling. Warren Spector, then-president and co-chief operating officer, has already resigned his posts in the aftermath. The scandal could do lasting damage to Bear's once-mighty, mortgage-backed bond underwriting and trading businesses, says Frank Partnoy, a former Wall Street derivatives trader turned professor at the University of San Diego Law School. "It's hard to imagine the brand recovering," he says. "It's going to be a long road to get there." The SEC, meanwhile, is looking into the hedge funds, and the U.S. Attorney's Office for the Eastern District of New York in late September launched an investigation of its own.

Now the 84-year-old investment bank, long admired for its scrappy ways in a world once dominated by white-shoe elites, may begin to distance itself from Cioffi, who remains a paid adviser there. Cioffi, meanwhile, may have to fight off accusations that he was a rogue trader. He will likely seek to prove that the valuations he oversaw were reasonable and that his comments to investors weren't intentionally misleading. Bear Stearns spokesman Russell Sherman says the firm took precautions against a market downfall, but the decline in mortgage-backed securities was unprecedented.

The quick collapse of the inelegantly named Bear Stearns High-Grade Structured Credit Strategies fund and High-Grade Structured Credit Strategies Enhanced Leverage fund conjures memories of Long-Term Capital Management, the multibillion-dollar fund that blew up in 1998. In both cases, the damage helped ignite a worldwide credit crunch that prompted intervention by central bankers. But there's an important difference: LTCM, run by some of the sharpest minds in finance, was built to do well in rising and sinking markets alike. It failed because its impossibly complex trading strategies went haywire.

The Bear funds cratered because their managers never came up with a Plan B to survive a downturn. Cioffi was more like a day-trader chasing tech stocks in the late 1990s than the Nobel laureates at LTCM.

## A Former Star

Until recently, Cioffi was a Bear Stearns star. The 1978 business administration graduate of Vermont's Saint Michael's College joined the firm in 1985 as a bond salesman and rose quickly. By 1989 he was head of the fixed-income sales group and eventually became a driving force behind Bear's move into sophisticated structured-finance products. About five years ago he considered leaving to launch his own hedge fund, people close to him say. But Bear enticed him to stay and run it out of Bear Stearns Asset Management.

Despite Cioffi's considerable expertise, however, there was surprisingly little financial artistry taking place inside the funds' Park Avenue corridors. The managers hadn't arrived at any blinding new insight into how markets work. Documents show that they were simply taking investors' money, leveraging it to the hilt, and then buying complex bonds called collateralized debt obligations, or CDOs, that were backed by subprime and other mortgages.

At the height in 2006, Cioffi was a central character in the booming mortgage CDO market, holding nearly $30 billion worth of securities. "Everybody wanted to do business with him because he was The Buyer," says a portfolio manager who was not authorized by his firm to speak for attribution. Cioffi's easygoing manner made him popular with investors, the bankers who lent his funds money, and the charities he supported.

## END GAME

But his investment strategy turned into subtraction soup: The more he ate, the hungrier he got. The funds' voracious buying of lightly traded bonds drove down their yields, meaning Cioffi's team had to buy more and more of them to boost returns. That meant more borrowing. Banks such as Merrill Lynch (MER), Goldman Sachs (GS), Bank of America (BAC), and JP Morgan Chase (JPM) lent the funds at least $14 billion all told. Cioffi also used a type of short-term debt to borrow billions more; in some cases he managed to buy $60 worth of securities for every $1 of investors' money. But he made a critical trade-off: For lower interest rates, he gave lenders the right to demand immediate repayment.

For a while the strategy worked, and the fund became a hit. Cioffi started dabbling in fashionable hedge fund manager accoutrements, weighing a partnership stake in a Gulfstream jet and even getting into the movie business. In 2006, he was executive

producer of the indie film *Just Like My Son*, starring Rosie Perez.

But when the markets turned earlier this year and the CDOs values plunged, Cioffi's lenders demanded repayment, and the borrow-and-buy game was over. Making matters worse, the funds held only about 1% of their assets in cash, much less than the 10% that many hedge funds keep on hand for emergencies. "This is not prudent investing," says one structured-finance market veteran who asked not to be identified. "It's not rocket science to conclude that piling market-value risk on illiquid instruments is risky."

If the extreme leverage hadn't killed the funds, their Byzantine structure might have. The Enhanced fund, launched in August, 2006, gave an enormous amount of control to Barclays. The British bank provided at least $275 million in capital and in exchange was designated the sole equity investor, according to the fund's 2006 audited financials and bankruptcy filings. The other investors in the Enhanced hind merely held a stake in a complicated derivative contract that mimicked the fund's gains or losses but conferred no actual ownership rights.

The arrangement allowed Bear to get the fund up and running quickly, but it also meant that Barclays held the power to pull its stake and potentially close the fund down. Such a move could have weakened the High-Grade fund, too, because that fund was invested in similar securities. If the Enhanced fund started dumping its holdings to pay back Barclays, that could send the prices of the securities in the High-Grade fund tumbling (just as massive selling of a stock would drive down its price for other investors). A cascading event could have brought down both funds.

The final blow for the Enhanced fund came when Barclays told Bear it wanted out, according to the bankruptcy filings. The timing of the redemption notice isn't clear. Barclays declined to comment on the relationship, except to say its losses were minimal.

Hedge fund experts say the setup was unusual. Its not uncommon for investors to use derivatives to gain exposure to market indexes and indexes of broad hedge fund management strategies. But funds rarely allow them on a single portfolio fund with one equity investor. "A few hedge funds have done this kind of [deal], but it isn't terribly common," says Janet Tavakoli, a derivatives trading consultant.

Some of the details were spelled out in the abstruse language of the Enhanced fund's confidential offering memorandum. On page 50 it says Barclays' "interests in terminating the Leverage Instrument might conflict with the interest of the shareholders." But many investors now say they didn't understand the warning. A number of them had already been in the High-Grade fund, which was launched in October, 2003, and say they were encouraged by Cioffi's team to move their money to the Enhanced fund. They say they were led to believe that the newer fund would have a similar structure, except that it would use more leverage through a deal with Barclays.

22

## A RED FLAG

The investors who remained only in the High-Grade fund say they were told nothing of the Barclays relationship. Doug Hirsch, an attorney with New York-based Sadis & Goldberg, who represents Navigator Capital Advisors, a hedge fund that has filed a class action over the collapse of the fund, says: "If the viability of the High-Grade fund was jeopardized as a result of the structure of the newly formed Enhanced leverage fund, then that is certainly a risk factor that needed to be disclosed."

The funds' peculiar architecture wasn't their only problem. As the borrow-and-buy gambit grew less profitable, they sought out increasingly esoteric bonds and other lightly traded securities that offered higher yields. The funds were big buyers of so called CDO-squareds-CDOs that invest in other CDOs. For example, the funds at one time held $135 million of securities issued by Mantoloking CDO, a CDO-squared; $135 million of Pyxis Master, a one-of-a-kind CDO structure: and $120 million worth of securities from CDO issuer Abacus. Over time the holdings got so exotic that some had no published credit ratings and couldn't be valued by outside pricing services. The funds held $280 million worth of various entities so obscure that one bond veteran found no trace of them in any market registries.

The irregular and illiquid securities seemed to help boost returns. The High-Grade fund posted a cumulative gain of 46.8% before the bottom began to fall out, say reports to investors. In 2006 it rose 11%. The Enhanced fund returned 6.3% in less than six months' time in 2006.

But documents suggest those return numbers may have been shaky. The 2006 audited financial statements for both hedge funds contained a potentially worrisome note from Deloitte & Touche, the longtime auditor for Bear Stearns and its affiliated entities. Deloitte warned that a high percentage of net assets at both funds were being valued using estimates provided by Cioffi's management team "in the absence of readily ascertainable market values." Deloitte went on to caution: "These values may differ from the values that would have been used had a ready market for these investments existed, and the differences could be material." In the case of the High-Grade fund, 70% of its net assets, or $616 million, were being valued in such a manner, up from just 25% in 2004. For the Enhanced fund, 63% of net assets, or $589 million, were "fair valued."

A hedge fund's net asset value is simply its assets minus its liabilities, akin to a small investor's net worth. It's the key to tracking its profitability—and the measurement on which its fees are based. Deloitte's language was a warning to investors that if the estimates were wrong, they could have substantial losses. It also raised the possibility that the past performance, and hence fees, might have been based on squishy numbers. "It may have been an early warning sign," says Barry M. Levine, a hedge fund forensic analyst who often serves as an expert witness in securities litigation and who reviewed

23

the Bear Stearns funds' financial statements for Business Week. "Obviously, Deloitte had misgivings. I'm not saying there was anything wrong, but if there was an overvaluation, it could have had a big impact on the funds' profitability." Deloitte says it doesn't comment on client matters.

Bear spokesman Sherman says net asset value is the wrong point of comparison. Bears' fair-value assets accounted for less than 10% of the funds' total assets, he says, and the Deloitte comment was a "standard disclosure."

Valuation games are surprisingly common. A study this summer by Riskdata, a hedge fund risk consulting group, found that at least 30% of hedge funds that rely on illiquid trading strategies are "smoothing returns" to make a fund's performance appear less risky by evening out month-to-month volatility. The study, which was published in June, included the Bear funds among those it examined. "The Bear Stearns hedge funds had a profile that's typical of funds that smooth earnings," says Olivier Le Marois, Riskdata's chief executive officer. "Smoothing returns is very misleading."

Deloitte's warning came too late to matter to investors turning wary in the spring. The 2006 audited financials for the High-Grade fund didn't begin arriving in investors' e-mail until mid-May, just two weeks before Bear Stearns suspended redemptions in the Enhanced fund. Many investors in the fund say they never received a copy.

### Marketing/Memoranda Mismatch

What drove Cioffi and his team? It may have been the fees. Like most hedge funds, Cioffi's kept 20% of any profits they generated, plus 2% of the net assets under management. The High-Grade fund had become a fee engine for Bear Stearns Asset Management, accounting for three-quarters of its revenues in 2004 and 2005, according to CDO tracker Derivative Fitch. The deal with Barclays was a way to start a new fund and prime it for returns — and more fees — quickly. And by encouraging the investors in the High-Grade fund to transfer money to the Enhanced Band, Cioffi didn't have to waste time wooing new customers; he could go to the same ones he'd already won over.

Now many of those who bought in claim they were misled. The offering memoranda for both funds contained the usual statements about how investors could lose all of their money. But some of the investors say that's not how the Bear Sterns funds were marketed by Cioffi and co-manager Matthew Tannin. They say they were told to expect small but steady gains of 1% to 2% a month, and never had to fear losing their entire investment. In a worst-case scenario — a perfect storm, they called it — the funds might lose 10% in a year.

Not everyone was convinced. Neil Smith, director of money manager Altus Investment

24

Management in London, learned of the High-Grade fund during a hedge fund conference at London's Four Seasons Hotel (FSH) in February, 2006. He says the presentation left him thinking the managers were making impossible claims. Smith says Tannin explained the fund needed a lot of leverage to generate high returns, but that it was O.K. because the investment strategy was sound and the CDOs were highly rated securities. "What he was trying to do was say how safe it was, how conservative it was," says Smith. "I came away thinking it was a disaster." A friend who attended the same conference wasn't so skeptical. Now he says he's trying to line up a lawyer for a potential suit. Tannin's lawyer, Nina Beattie, did not return phone calls seeking comment.

## BRAZEN EFFORT

The managers' upbeat talk continued well into the subprime meltdown. Tannin told several investors in March that "we wouldn't have made money in February if we were long, or overexposed, to subprime," recalls one listener. Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

In a brazen effort to stay afloat, Cioffi's team unveiled on May 9 a plan to bring public Everquest Financial. The company, formed in late 2006 and co-managed by Cioffi and Bear Stearns, had acquired some of the riskiest securities in the hedge funds' portfolios. A public offering could have created a rich trading vehicle to prop up the hedge funds until the storm passed. But the plan was met with a howl of protest on Wall Street and was scrapped. The reaction unnerved bankers and set in motion the process that resulted in the lenders calling their loans.

Now Cioffi, who has been named an adviser to Bear Stearns Asset Management, and Tannin, still a senior managing director there, face major legal troubles. Securities lawyers say valuation issues often pique prosecutors' interest. In 2004, managers of Beacon Hill Asset Management paid $4.4 million in penalties to the SEC to settle charges that they fudged valuations. That same year, Edward Strafaci pleaded guilty in federal court to charges that he manipulated the valuations for securities held by a fund run by former New York City Deputy Mayor Kenneth Lipper. "Valuation fraud is one of the touchstones of hedge fund fraud," says Scott Berman, a New York securities attorney who has litigated several hedge fund fraud cases. "It typically occurs when people don't start out to commit a fraud, but have losses they are trying to cover up."

The new revelations about Bear don't prove the firm intended to defraud investors, but they raise many troubling questions. Now lawyers are circling, and Cioffi, the man once so good at convincing investors and lenders to turn over money, is facing the toughest sales job of his life.

76.    Then, on November 14, 2007, Bear Stearns was finally forced to begin to

25

reveal the extent of its losses, when it announced a write-down of $ 1.2 billion of mortgage-backed debt instruments held on its balance sheets. By November 30, 2007, that amount of the write-downs had risen to $1.9 billion.

77.     During 2007, the Company's profits fell 90 percent. It reported a larger-than-reported writedown of its mortgage portfolio, leading to its first quarterly loss in its 84-year history. In addition, the Company suffered a loss of $859 million in the fourth quarter of 2007.

78.     On January 4, 2008, the news broke that U.S. prosecutors were making inquiries into the Bear Stearns hedge funds collapse.

79.     On January 8, 2008, Defendant Caynes stepped down as the Company's CEO, although he maintained his position on the Board.

80.     As Bloomberg.com reported, on March 10, 2008 Bear Stearns stock dropped to a 5 year low of $62.30 "on speculation of a liquidity crisis."

81.     Nonetheless, the Company continued to maintain that it was not at risk of collapse. On March 10, Defendant Schwartz stated in a press release that "Bear Stearns' balance sheet, liquidity, and capital remain strong." However, that was not even close to accurate.

82.     On March 13, 2008, the Company sought and obtained emergency funding backed by the federal government. As revealed on the afternoon of March 13, firms that had been willing to accept Bear Stearns collateral began demanding cash instead. In addition, it was later revealed that during the weeks leading up to March 13, large hedge funds such as Citadel Investment Group and Renaissance Technology Group had pulled their accounts from Bear Stearns and placed them with other brokers.

83.     During the week, of March 10, 2008, Bear Stearns sought assistance from J.P.

26

Morgan, and together the two companies approached representatives of the Federal Reserve to craft a solution. The Federal Reserve assessed the situation to be so dire that it invoked a seldom-used law to bail out the Company.

84.     After extensive discussions, early on the morning of March 14, 2008, the Federal Reserve decided to extend a loan to Bear Stearns. The terms of the arrangement are such that, for an initial 28 days, J.P. Morgan will borrow money from the Federal Reserve and re-lend it to Bear Stearns. However, if Bear Stearns fails and the collateral it has provides to .J P. Morgan proves insufficient to cover the loans, the loss will be borne by the Federal Reserve — not J.P. Morgan.

85.     However, even after this extraordinary loan was announced, Defendant Schwartz claimed in a press release that the loan was simply "an important step to restore confidence in the marketplace, strengthen our liquidity and allow us to continue normal operations."

86.     During the week of March 10, 2008, the Company's stock plunged. The Company's share value fell 18.6% between the morning of March 10 and the close of the market on March 13. In the early morning hours of March 13, the stock was trading at $50.57. But by the close of the market on March 14, Bear Stearns was trading at $30.

87.     However, during this time period, no Bear Stearns employee was allowed to sell their Company stock. As a result of a lock-down on all employee stock sales prior to the company's earning announcements, no employee could sell any Company stock even as its value disappeared.

88.     Then, during the weekend of March 15 and 16, 2008, the Company was sold to J.P. Morgan at fire-sale prices. At the urging of the federal government, J.P. Morgan agreed to

27

purchase Bear Stearns for $2 a share — a total of only $236 million.

89.    During the Class Period, the Company stock experienced an incredible decline.
On December 14, 2006 (the beginning of the Class Period), Bear Stearns stock closed at $157.89
per share and reached a Class Period high close of $169.61 per share on January 12, 2007, as a
result of Defendants' concealment of the truth regarding the Company's artificially inflated
revenues and its failure to accurately report its true financial condition.

90.    Plan participants suffered drastically as Bear Stearns' stock price plunged. As of
March 14, 2008, the stock price had dropped 81% from the beginning of the Class Period.  After
the sale to J.P. Morgan for $2 a share, the Company stock opened at $3.17 on March 17, 2008, a
98% drop from the beginning of the Class Period.

## E.    Defendants' Stock Sales During The Class Period

91.    During the Class period, in the midst of the Company's misrepresentations to Plan
participants, Defendant Cayne sold 46,415 shares of Bear Stearns stock for $7,645,478.

92.    During the Class period, in the midst of the Company's misrepresentations to Plan
participants, Defendant Schwartz sold 23,333 shares of Bear Stearns stock for $3,823,221.

93.    During the Class period, in the midst of the Company's misrepresentations to Plan
participants, Defendant Spector sold 116,255 shares of Bear Stearns stock for $19,066,373.

94.    During the Class period, in the midst of the Company's misrepresentations to Plan
participants, Defendant Molinaro sold 10,826 shares of Bear Stearns stock for $1,762,937.

95.    During the Class period, in the midst of the Company's misrepresentations to Plan
participants, Defendant Greenberg sold 157,982 shares of Bear Stearns stock for $25,755,957.

## VIII.

## THE LAW UNDER ERISA

96.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

97.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

98.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

99.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things:

        (a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this

29

instance the Company stock Fund which invested in Company stock, to ensure that each investment is a suitable option for the Plan.

(b)     A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

(c)     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

100.    ERISA § 405(a), 29 U.S.C. 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that "[i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

101.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan

30

arising out of the breaches of fiduciary duties by the defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

102.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

103.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, the defendants did exactly the opposite. As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Company stock as a result of their investment directions, and the defendants remained entirely responsible for losses that result from such investment.

104.    Because ERISA § 404(c) does not apply here, the defendants' liability to the Plan, the Plaintiff and the Class for relief stemming from participants' decisions to invest contributions in Company stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

105.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which

31

was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected

by the fiduciaries and presented as an option to participants, and as a result of such action the

Plan suffers a loss. Because this is precisely what occurred in this case, defendants are liable for

the losses incurred by the Plan.

## CLAIMS FOR RELIEF

### COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**

**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

106.    Plaintiff incorporates the allegations contained in the previous paragraphs
of this Complaint as if fully set forth herein.

107.    At all relevant times, as alleged above, all defendants were fiduciaries within the
meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

108.    As alleged above the defendants were all responsible, in different ways and
to differing extents, for the selection and monitoring of the Plan's sole investment
options-namely, Company stock.

109.    Under ERISA, fiduciaries who exercise discretionary authority or control
over management of a plan or disposition of a plan's assets are responsible for ensuring that
investment options made available to participants under a plan are prudent. Furthermore, such
fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The
defendants were responsible for ensuring that all investments in Company stock in the Plan were
prudent. Defendants are liable for losses incurred as a result of such investments being
imprudent.

32

110.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

111.    The defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these defendants knew or should have known that Company stock was not a suitable and appropriate investment for the Plan as described herein. Investment in Company stock during the Class Period clearly did not serve the Plan's purposes of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' savings. Despite all of this, these fiduciaries continued to offer the Company stock as an investment option for the Plan. In so doing, defendants further breached their fiduciary duties. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in Company stock. Further, given that such a high concentration of the assets of the Plan were invested in the stock of a single company, defendants were obliged to have in place some financial strategy to address the extreme volatility of single-equity investments. All categories of defendants failed to implement any such strategy.

112.    Specifically, the Company and at least some of the individual defendants

33

had actual knowledge of the Company's corporate malfeasance and breakdown in internal controls and/or constructive knowledge of these activities due to their high-ranking positions at the Company. Despite this knowledge, they participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing participants that the Plan's holdings of Company stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Company stock, despite inarguably having knowledge of such breaches.

113.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Company stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Company stock.

114.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their investments meant to help participants save for retirement. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants

### and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

34

115. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

116. At all relevant times, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

117. As alleged above, the scope of the defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to participants regarding the Plan and assets of the Plan. In addition, the defendants had a duty to provide participants with information they possessed that they knew or should have known would have an extreme impact on the Plan.

118. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding investment options such that participants can make informed decisions with regard to investment options available under the Plan. This duty applies to Company stock held by Participants in the ESOP.

119. Because the Plan's assets were invested in Company stock, such investment carried with it an inherently high degree of risk. This inherent risk made the defendants' duty to provide complete and accurate information particularly important with respect to Company stock.

120. The defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Company stock, making material

35

misrepresentations about the status of the Company's internal controls, and, generally, by conveying inaccurate information regarding the soundness of Company stock and the prudence of investing retirement contributions in the stock.

121.    Upon information and belief, the Company's communications to the market were disseminated directly to *all* participants, including the Prospectuses which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports. In addition, upon information and belief, defendants communicated directly with *all* participants regarding the merits of investing in Company stock in Company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding Company stock as required by ERISA.

122.    These failures were particularly devastating to the Plan and the participants, as the Plan's assets were invested almost exclusively in Company stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of participants' retirement assets.

123.    In addition, defendants knew or should have known that information they possessed regarding the true condition of Bear Stearns and its breakdown in internal controls would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these defendants failed to provide participants with this crucial information.

124.    As a consequence of the failure of the defendants to satisfy their disclosure obligations under ERISA, participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Company stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by participants, that Company stock

36

was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, participants could have protected themselves against losses accordingly, and consequently, participants relied to their detriment on the incomplete and inaccurate information provided by defendants in their fiduciary communications and failures thereof.

125.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

# Failure to Monitor the Executive Committee and Provide It with Accurate Information
# (Breaches of Fiduciary Duties in Violation of ERISA § 404 by the Company and the Director Defendants)

126.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.    The defendants in this Count are the Company and the Director Defendants.

128.    At all relevant times, as alleged above, the Company and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, as alleged above, the scope of the fiduciary responsibility of these defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the Executive Committee members and any other as yet unnamed fiduciaries charged/delegated

37

with fiduciary authority and responsibility regarding the administration of the Plan and the investment/prudent management of the Plan's assets). In this ease, that means that the monitoring fiduciaries, the Company and the Director Defendants, had the duty to:

(a)    Ensure that the Executive Committee members possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's participants;

(b)    Ensure that the Executive Committee members were provided with adequate financial resources to do their job;

(c)    Ensure that the Executive Committee members had adequate information to do their job of overseeing the Plan's investments and determining whether Company stock should be offered as a Plan investment;

(d)    Ensure that the Executive Committee members had ready access to outside, impartial advisors when needed;

(e)    Ensure that the Executive Committee maintains adequate records of the information on which it bases its decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the Executive Committee reports regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

129.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

38

investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in its possession that it knows or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

130.     The Company and the Director Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems and breakdown in internal controls alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities. The Company and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently choosing to continue to offer the Bear Stearns stock as an investment for the Plan, and (ii) continuing to invest the assets of the Plan in Company stock when it no longer was prudent to do so. Despite this knowledge, the Company and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences or these fiduciaries' failures.

131.     In addition, the Company and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the Executive Committee accurate

39

information about the financial condition of the Company that they knew or should have known, that these defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these defendants breached their monitoring duties under the Plan and ERISA.

132.    The Company and the Directors Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the Executive Committee, they enabled the breaches by these defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

133.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their investments meant to help participants save for retirement.

134.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and 405 by all Defendants)

135.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136.    ERISA § 404(a)(1)(A), 29 U.S.C. § 104(4)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits

40

to participants and beneficiaries.

137.    Given the allegations made above, defendants clearly placed the interests of themselves and the Company above those of the Plan participants, as evidenced by (a) the longstanding artificial inflation of Company stock and (b) the volume of insider sales by Defendants at inflated prices. This conflict of interest put these defendants in the inherently problematic position of having to choose between their own interests as Directors, officers, executives (and stockholders), and the interests of the Plan's participants and beneficiaries, in whose interests the Defendants were obligated to loyalty serve with an "eye single."

138.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in the Company stock; failing to notify appropriate federal agencies, including the Department of Labor, of the facts and transactions which made Company stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Company stock.

139.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

41

## COUNT V

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA § 405 By Defendants)

140.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

141.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

142.    As alleged herein, the Company, through its officers and employees, withheld material information from Plan participants and provided Plan participants with misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to the Company as a matter of law. In addition, as alleged herein on information and belief, the defendants participated in and/or knew about the Company's misrepresentations about and problems with the merger and the breakdown in internal controls, and the consequent artificial inflation of the value of Company stock. Thus, the defendants had knowledge at all relevant times of the factual matters pertaining to the imprudence of Company stock as an investment for the participants' retirement assets.

42

143.    Despite this knowledge, the defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of Company stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in Company stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in Company stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(1)(C).

144.    In further violation of ERISA § 405(a)(1)(C), the Director Defendants also knew that inaccurate and incomplete information had been provided to participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of the Company's problems and further concealing such practices from participants.

145.    In addition, the defendants enabled the imprudent asset management decisions of any and all other defendants who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in Company stock. In so doing, these defendants

43

breached ERISA § 405(a)(1)(B). In further violation of ERISA § 405(a)(1)(B), defendants failed to provide the Executive Committee with information concerning the Company's breakdown in internal controls and artificial inflation of the stock, and disseminated materially inaccurate and incomplete information regarding Company stock in the Plan documents which incorporated by reference the Company's misleading financial statements.

146.    Further, through their failure to properly and effectively monitor their appointees, including those serving on the Executive Committee, and remove those whose performance was inadequate as alleged above, the Company and the Director Defendants enabled the imprudent management of the Company stock in the Plan.

147.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

148.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## IX.

## CAUSATION

149.    The Plan to date has suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested in Company stock during the Class Period, in breach of defendants' fiduciary duties. These losses to the Plan were reflected in the diminished account balances of the Plan's participants.

150.    Defendants are responsible for losses caused by the participants' direction

44

of investment in Company stock because defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Company stock, and defendants remain liable under ERISA for losses caused by such investment.

151.    Had the defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company stock, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Company stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

152.    The defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Company stock during the Class Period. As a consequence of the defendants' breaches, the Plan suffered significant losses.

153.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring

a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

154.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

155.    Plaintiff and the Class are therefore entitled to relief from the defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs; (v) interest on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper

156.    Under ERISA, each defendant is jointly and severally liable for the losses

46

suffered by the Plan in this case.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.     A Declaration that the defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     An Order requiring defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

G.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

47

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees and expenses pursuant to 29 U.S.C. §
1132(g) and the common fund doctrine;

J.    An Order for equitable restitution and other appropriate equitable monetary relief
against the defendants; and

K.    Such other relief as the Court deems appropriate.

Dated: June 4, 2008                    Respectfully submitted,

                                       STRANGE & CARPENTER

                                       _____
                                       Brian Strange, Esq. (CA Bar No. 103252)
                                       *lacounsel@earthlink.net*
                                       Gretchen Carpenter, Esq. (CA Bar No. 180525)
                                       *gcarpenter@strangeandcarpenter.com*
                                       David Swift, Esq. (CA Bar No. 235033)
                                       *dswift@strangeandcarpenter.com*
                                       STRANGE & CARPENTER
                                       12100 Wilshire Blvd., 19th Floor
                                       Los Angeles, CA  90025
                                       Telephone:  (310) 207-5055
                                       Fax:  (310) 826-3210

                                       _____
                                       TOLMAGE PESKIN HARRIS & FALICK
                                       Stephan H. Peskin (NY Bar No. SHP5433)
                                       20 Vesey Street
                                       New York, New York 10007
                                       Tel: 212-964-1390
                                       Fax: 212-608-4959
                                       *stephanpeskin@yahoo.com*

                                       Attorneys for Plaintiff

48